James E. VICKERS, d/b/a Delta Towing Company,

v.

Floyd W. TUMEY.

No. 18312.

United States Court of Appeals
Fifth Circuit.

April 12, 1961.

W. C. Keady, Greenville, Miss., George B. Matthews, New Orleans, La., Lemle & Kelleher, New Orleans, La., Farish, Keady & Campbell, Greenville, Miss., of counsel, for appellant.

Philip Mansour, Greenville, Miss., for appellee.

Before TUTTLE, Chief Judge, and BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The vessel owner appeals from a judgment entered in part on a jury verdict for damages and on separate findings of the Judge for maintenance, wages and cure occasioned by injuries sustained on the River Towboat Nita Dean. The errors urged are the failure of the Trial Court to direct a verdict for want of sufficient evidence of negligence or unseaworthiness, three errors in the Court's charge, and the allowance by the Judge of wages, as such, beyond the end of the voyage.

The injury—one of the few facts besides the name of the river and the vessel not hotly disputed—occurred on October 16, 1958. Tumey, a farmer and laborer and consequently a green, inexperienced hand, joined the tug on October 6, 1958. The tow had been uncoupled to go through a lock. While recoupling the barges and the tow by means of steel wire ropes (cables), he undertook to put his foot on a spoke of the wheel in the deck winch apparently to tighten down on the winch. He somehow lost his balance, fell to the deck, and broke his leg. He was put ashore and hospitalized for some time and after extended out-patient convalescence achieved maximum cure on March 9, 1959. He returned to work March 15, 1959.

No good would be served in detailing the evidence. While Tumey, as plaintiff,

was outnumbered by fellow crew members on nearly every crucial issue, this conflict was of the kind inherent in damage suits, either dry-land, amphibious or water-borne. The jury could have found, as he swore, that he had received no adequate instruction in the performance of this unusual task, there were no lights, it was pitch dark, and some fellow worker failed properly to wrap the cables around the fitting. On the other hand it could have held that the lights were so bright that one could—as one witness put it—read a newspaper, the green horn had been instructed and warned against the method being used, the cables were properly wrapped and the machinery was all in fine working order.

■■ Resolution of this fact dispute was for the jury. On it the evidence satisfies the standard under the Jones Act, 46 U.S.C.A. § 688, as it is variously stated. "Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." Rogers v. Missouri Pacific Ry. Co., 1957, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493; Ferguson v. Moore-McCormack, 1957, 352 U.S. 521, 523, 77 S.Ct. 457, 1 L.Ed.2d 511, 1957 A.M.C. 647.[1]

On the complaint of errors in the charge, the most substantial one relates to the instructions on the nature of the Shipowner's duty. The Court at one spot literally stated that it "was the duty of the defendant, the owner of this boat and these barges, to furnish to the plaintiff a reasonably safe place within which to work." At another place he made a shorthand reference to the action to be taken if the jury found the Shipowner "failed to provide such a place to work" and in translating the general instructions to a specific complaint of failure of adequate lights, he introduced it by the broad language "in dealing with the duty to furnish a safe place within which to work * * *."

While these things at times appear to border on metaphysical dialectic, the owner so far has a basis for urging this to have been wrong in an important respect. Specifically, the criticism is that the *duty* to furnish, as is the object of such furnishing, must be qualified by due care. That would require the instruction to read that "it was the duty of the vessel owner to [1] use reasonable care in furnishing a [2] reasonably safe place to work." The legal concept "reasonable" applies, then, both to the act of furnishing and the thing or condition to be furnished. This, the owner insists, is what was substantially held in Atlantic Coast Line R. Co. v. Dixson, 5 Cir., 1951, 189 F.2d 525, 527–28; and Anderson v. Elgin, Joliet & Eastern Ry. Co., 7 Cir., 1955, 227 F.2d 91, 97.

■ Of course with a statute transplanted from the switchyard to navigable waters, it would be doctrinaire to suggest that incorporation of FELA by the Jones Act necessarily brought along identical standards and application. It would be *clearly wrong because it would* ignore the essential differences in con-

1. This principle has had frequent application: Sentilles v. Inter-Carribean Shipping Corp., 1959, 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142, 1960 A.M.C. 10; Kernan v. American Dredging Co., 1958, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382, 1958 A.M.C. 251; Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668, 1956 A.M.C. 737; Davis v. Virginia Ry. Co., 1959, 361 U.S. 354, 80 S.Ct. 387, 4 L.Ed.2d 366; Innman v. Baltimore & Ohio R. Co., 1959, 361 U.S. 138, 80 S.Ct. 242, 4 L.Ed.2d 198; Conner v. J. Turner Butler, 1959, 361 U.S. 29, 80 S.Ct. 21, 4 L.Ed.2d 10; Harris v. Pennsylvania R. Co., 1959, 361 U.S. 15, 80 S.Ct. 22, 4 L. Ed.2d 1; Moore v. Terminal R. Ass'n of St. Louis, 1958, 358 U.S. 31, 79 S.Ct. 2, 3 L.Ed.2d 24; Ferguson v. St. Louis San Francisco R. Co., 1958, 356 U.S. 41, 78 S.Ct. 671, 2 L.Ed.2d 571; Stinson v. Atlantic Coast Line R. Co., 1957, 355 U.S. 62, 78 S.Ct. 136, 2 L.Ed.2d 93; Gibson v. Thompson, 1957, 355 U.S. 18, 78 S.Ct. 2, 2 L.Ed.2d 1; Ringhiser v. Chesapeake & Ohio R. Co., 1957, 354 U.S. 901, 77 S.Ct. 1093, 1 L.Ed.2d 1268; see annotation on sufficiency of evidence in FELA cases, 4 L.Ed.2d 1787.

ditions and circumstances of employ- ment. The Arizona v. Anelich, 1936, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075, 1936 A.M.C. 627; Beadle v. Spenser, 1936, 298 U.S. 124, 56 S.Ct. 712, 80 L.Ed. 1082, 1936 A.M.C. 635. This difference, and the likely difference in the applica- tion of this common statute was forecast by Cardozo's words in a case in which the broad principles of FELA found an ap- plication quite beyond any expectation for railroad workers. "The [FELA] act for the protection of railroad em- ployees does not define negligence. It leaves that definition to be filled in the general rules of law applicable to the conditions in which a casualty occurs." Cortes v. Baltimore Insular Line, 1932, 287 U.S. 367, 377, 53 S.Ct. 173, 176, 77 L.Ed. 368, 1933 A.M.C. 9; Cox v. Roth, 1955, 348 U.S. 207, 209, 75 S.Ct. 242, 99 L.Ed. 260, 1955 A.M.C. 942; Gilmore & Black, The Law of Admiralty § 6–26 at 297 (1957); 2 Norris, The Law of Sea- men § 686 at 368 (1952).

■ Besides the physical aspects of maritime employment which inescapably gives living and working a common ex- perience, a significant factor in the ap- plication of the Jones Act is the tradi- tional idea of the duty to provide a sea- worthy vessel. The duty to furnish gear, fittings, appliances, etc., which are rea- sonably fit—i. e., seaworthy, is absolute. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, 1960 A.M.C. 1503.[2] Undoubtedly this unique and awesome obligation has led courts in Jones Act cases to express the shipowner's duty toward seamen along these lines. "The obligation of a ship- owner to his seamen is substantially greater than that of an ordinary employ- er to his employees. * * *." The own-

er has "the duty of furnishing" a seaman "a safe place in which to work and" is "responsible for a seaworthy ship and safe equipment. This duty is absolute and not merely a result of the Jones Act." Interocean S.S. Co. v. Topolofsky, 6 Cir., 1948, 165 F.2d 783, 784, 1949 A.M.C. 198; 2 Norris, The Law of Sea- men § 688 at 376 (1952). This echoed the like statement "It is the duty of the vessel to provide a safe working place for members of its crew" in Sadler v. Pennsylvania R. Co., 4 Cir., 1947, 159 F.2d 784, 786, 1947 A.M.C. 636. And dis- cussing the specific problem against the backdrop of § 282 of the Restatement of Torts, the Third Circuit put it this way. "A standard of conduct established by law with respect to employers of sea- men is that they shall provide their em- ployees with a safe place in which to work." Armit v. Loveland, 3 Cir., 1940, 115 F.2d 308, 311, 1940 A.M.C. 1429. And in a case in which it was inescapable that it contrast work at sea with work on railroads, the Supreme Court took notice, without criticism, of the fact that the jury had been instructed that "the ship- owner is under a duty to furnish a sea- man with a safe place in which to work * * *." Socony-Vacuum Oil Co. v. Smith, 1939, 305 U.S. 424, 428, 59 S.Ct. 262, 265, 83 L.Ed. 265, 1939 A.M.C. 1.

There may be, of course, some possible difficulties in a conceptual way. One might argue plausibly that when the duty to furnish a reasonably suitable appli- ance is absolute, as it certainly is under the broad command to furnish a sea- worthy vessel, that is the statement of a legal duty of like absoluteness. Conse- quently, a failure to perform that duty— no matter what the excuse—is a breach of a legal duty owed. That, of course, is

---

2. The Trial Court, without objection, so instructed the jury:

"* * * [U]nder general maritime law, a shipowner owes to every sea- man * * * on his vessel * * * the duty to provide a vessel and all equipment, appliances, gear and appurte- nances in a seaworthy condition. * * *

"* * * Under maritime law there

is an absolute duty imposed on the ship- owner to provide a seaworthy vessel as I have defined that term to you. * * * This duty is absolute in character and not satisfied by mere exercise of rea- sonable care."

The term "seaworthy" was defined as set out in note 5, infra.

the classic test under normal tort concepts to determine the existence of negligence.

But despite the difficulties, a difference is recognized having different legal consequences. Just recently this has been reiterated in a pointed way. "Here," the Supreme Court states, "a distinction" must "be noticed between the unseaworthiness and Jones Act claims * *." The Court goes on. "The vessel's duty to furnish seamen with tools reasonably fit for their intended use is absolute * * *; and this duty is completely independent of the owner's duty under the Jones Act to exercise reasonable care." Michalic v. Cleveland Tankers, 1960, 364 U.S. 325, 327, 81 S.Ct. 6, 9, 5 L.Ed.2d 20, 1960 A.M.C. 2251. At that point the Supreme Court then expressly adopts what we had earlier said in Cox v. Esso Shipping Co., 5 Cir., 1957, 247 F.2d 629, 1957 A.M.C. 1927. "One is an absolute duty, the other is due care. Where * * the ultimate issue * * * [is] seaworthiness of the gear * * * the owner has an absolute duty to furnish reasonably suitable appliances. If he does not, then no amount of due care or prudence excuses him, whether he knew, or could have known, of its deficiency at the outset or after use. In contrast, under the negligence concept, there is only a duty to use due care, i. e., reasonable prudence, to select and keep in order reasonably suitable appliances. Defects which would not have been known to a reasonably prudent person at the outset, or arose after use and which a reasonably prudent person ought not to have discovered would impose no liability." 247 F.2d at page 637; 364 U.S. 328, 81 S.Ct. 6.

The distinction is manifested by the Court's translation of the problem into specific terms of this record. After first stating that the question in the seaman's unseaworthiness claim was the "single one as to * * * whether the wrench * * * was a reasonably suitable appliance for the task * * * assigned * * *," the Court contrasts the Jones Act claim with respect to the very same tool, i. e., the wrench. "To support the Jones Act claim, however, the evidence must also be sufficient to raise a jury question whether the [owner] failed to [1] exercise due care in furnishing a wrench which was [2] not a reasonably suitable appliance." 364 U.S. at page 328, 81 S.Ct. at page 10.

This distinction has been expressly recognized in the past. Actually, the one—Jones Act—does not seek to undermine, that is, lessen, the other—seaworthiness. Seaworthiness is still the absolute duty it was before the statute. But the statute with its many new remedial advantages puts at least one condition on its application—the necessity for a failure to exercise due care in the execution of a duty—whether such duty was absolute or relative. All this was said by Cardozo in Cortes v. Baltimore Insular Line, Inc., supra, 287 U.S. at page 378, 53 S.Ct. at page 176. "Congress meant no more than this, that the duty must be legal, i. e., imposed by law; that it shall have been imposed for the benefit of the seaman, and for the promotion of his health or safety; and that *the negligent omission to fulfill it* shall have resulted in damage to his person. When this concurrence of duty, of *negligence* and of personal injury is made out, the seaman's remedy is to be the same as if a like duty had been imposed by law upon carriers by rail." (Emphasis supplied.)

Of course the FELA, 45 U.S.C.A. §§ 51–60, incorporated as the standard by the Jones Act, 46 U.S.C.A. § 688, speaks in these very terms. "Every common carrier by railroad * * * shall be liable in damages * * * for * * * injury or death resulting in whole or in part from the *negligence* of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, *due to its negligence*, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment. * * *" (Emphasis supplied.)

And leading scholars in this field have pointed this out. "It should be noted

that both branches of the FELA provision are expressly conditioned on negligence; thus under the Jones Act it could hardly be argued that a shipowner could be liable without fault even on the unseaworthiness side." Gilmore & Black, The Law of Admiralty § 6–34 at 309 (1957).[3]

When it comes to testing the charge against these legal principles, we think they are satisfied when the charge is considered as a whole as it must be. For example, after the brief reference to "dealing with the duty to furnish a safe place within which to work," the Court translated this in terms of the several specific complaints which made the place to work unsafe. One was the lack of lights. As to this the charge states that the plaintiff contends that the Owner *"negligently* failed to furnish a *sufficient* amount of illumination."* The italicized terms are each shorthand expressions connoting the notion of reasonableness, i. e., the failure to exercise reasonable care to furnish, and lights which were not reasonably bright. This was carried forward in the definitive instruction that stated that the Owner's failure "to *reasonably* furnish a *proper* amount of illumination" would on a finding of proximate cause,

require a verdict for Tumey. For like reasons this conveyed the dual notion of reasonable care in both the duty to furnish and that which was furnished. The same was true as to the specific charge of inadequate instruction to this green, inexperienced hand. The Court charged " * * * Should you find * * * that the defendant [1] negligently failed to [2] reasonably warn and reasonably instruct the plaintiff * * *," a verdict should be returned. So also was it concerning the manner of wrapping the wire cables around the buttons.

We think that with regard to each and all of the specific elements charged as making the place unsafe for work, the jury was adequately instructed that this was to be measured against the [1] exercise of reasonable care to make the place [2] reasonably safe in the particulars claimed. The distinction, fine as it may be, and conceptually difficult as it perhaps sometimes seems in special situations, was preserved.[4] It is ironic that perhaps it was clearer to the jurors than the subject is to lawyers or judges. There was no harmful error.

The case was submitted on both negligence and unseaworthiness. The Court

---

3. Elsewhere they state:

Gilmore & Black, supra § 6–36 at 311: "The Jones Act plaintiff bears the burden of going forward with the evidence on the essential elements of a negligence action: the existence of a duty; *the negligent violation of the duty* by the defendant; and the causal relationship of violation to injury."

§ 6–37 at 313: "The range of 'negligence' under the Jones Act has become wide indeed. It covers all types of unseaworthiness, with the exception (at least in theory) of unseaworthiness for which the shipowner is in no way at fault. * * * Jones Act cases of this type may speak in terms of a 'negligent failure to furnish a seaworthy ship' or of a 'violation of the duty to provide a safe place to work' * * * The law has seen the gradual development of 'liability without fault'; if the argument outlined above should be accepted, we would be in the presence of a creation which might be described as 'negligence without fault;' and the law seems to be running in that direction. * * *"

4. As we point out in note 9, infra, the use of special interrogatories with appropriate instructions under F.R.Civ.P. 49(b) enables the Court to separate distinctly such distinct theories of recovery or defense and, at the same time, tie specific instructions into specific definitive actions. Such a procedure may also isolate, and occasionally immunize, errors enabling the appellate court to determine the cause finally by one trial and one appeal. The waste in precious judicial time of a single general verdict under a general charge covering both unseaworthiness and negligence is strikingly illustrated in United New York & New Jersey Sandy Hook Pilots' Ass'n v. Halecki, 1959, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed. 2d 541, 1959 A.M.C. 588, see especially 358 U.S. at page 618–19, 79 S.Ct. 518–519. After retrial on the negligence count, the case wends its way back again. Halecki v. United New York & N. J. Sandy Hook Pilots' Ass'n, 2 Cir., 1960, 282 F.2d 137, 1960 A.M.C. 1807.

gave an instruction on the term sea-worthiness [5] which the vessel owner concedes was adequate so far as it went. The complaint is that more was needed. The written requested charge was apparently patterned on McLeod v. Union Barge Line Company, D.C.W.D.Pa., 1951, 95 F.Supp. 366, 369, 1951 A.M.C. 1049. Conceding that reversal certainly ought not to come from mere literary choices, as the Judge undertakes to make clear for untrained laymen what is complex and often abstruse to lawyers, the attack is centered on the omission of the idea that seaworthiness is a relative concept [6] somewhat as stated in Pinion v. Mississippi Shipping Co., D.C.E.D.La., 1957, 156 F.Supp. 652, 656, 1957 A.M.C. 2308.

 There are many ways to express this idea of seaworthiness. If it is as the Owner's brief asserts a "mysterious concept" it was not to be dispelled by the addition requested. Moreover, the charge as given referring to "the circumstances existing at the time of injury" makes it plain that is a relative term depending on circumstances, equipment, appliances, work to be performed and the like. There was no reversible error here.

 The Court acceded to the Owner's insistence, based presumably on Romero v. International Terminal Operating Co., 1959, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368, 1959 A.M.C. 832, that that portion of the complaint seeking recovery for maintenance, wages and cure under the general maritime law was for trial by the Court sitting in admiralty and not for the jury. This made it necessary to instruct the jury that these items were for the consideration of the Judge alone. This was especially true since general evidence heard by the jury on the damage phase would encompass these items. This the Judge did in simple and understandable terms.[7]

Again, the point of difference is narrow. The Owner again insists that it was defective by omission. The omission this time was in failing positively to instruct in some suitable language that the "plaintiff is entitled, as a matter of law, to payment of these items without any regard to the presence or absence of negligence on the part of his employer, and the court will fix the amount to be paid for his maintenance and cure."

It was certainly proper, since the jury had heard evidence which would be pertinent to these matters, to make certain that they would not be taken into account in reaching the amount of damages. That is what the Court did. It was really not a matter of concern to the jury why that was so. The whole system is based upon the assumption that the Judge delivers the law, the jury understands the Judge's deliverance, and the jury obeys it. For understandable reasons, the Owner felt it psychologically wise to convey the impression that there was no need for any extra-legal sympathy on the jury's part since they could rest easy on the legal certainty that each of these items for maintenance, cure and wages would be paid "as a matter of

---

5. The Court charged: "Seaworthy, as I have used it in these instructions to you, and as I will use it, means that under the circumstances existing at the time of injury, the vessel and her equipment, appliances, gear and appurtenances were reasonably fit to perform the duty of safety, which this vessel owed to human beings aboard her, and to perform duties for which they were intended." From context it is plain that the word "duty" as used connotated function or purpose or service.

6. Appellant's requested charge, included the following sentence. " 'Reasonably seaworthy' is a relative term, and it does not mean that the vessel must be perfect in all respects at all times, but it does mean that the vessel must be reasonably fit for the work which it is to perform."

7. "In considering the items, or elements, of damage, you are not to include any sum in such a calculation for medical and hospital expenses incurred by the plaintiff, or amounts expended by him for food, lodging or other care during the period of his disability up until now. Nor are you to consider wages to the end of the voyage. I have dealt with these items. I have referred to an initial calculation."

law." That in effect was a reason why the jury should obey the Court's instruction. They did not need a reason why. It was sufficient that the jury be told, not why, but *what*.

This method of segregating the negligence-unseaworthiness aspect from the maintenance-wages-cure phase led to the occurrence of the last asserted error. Indeed, we regard it as an error, but for reasons we develop, the error in approach produced a result precisely correct. Consequently, it comes assuredly within the sweep of the harmless error dealt with in F.R.Civ.P. 61.

The Judge fixed the amount of medical, hospital and similar bills and determined the sum for maintenance for out-patient convalescence. No criticism is made of this, the amounts, or the periods of time. The Judge also found wages due for the period of time from the date of the injury, October 16, 1958, to March 15, 1959, the date on which he was first able to return to work. No question is raised as to the mathematical calculation either on the monthly wage or the average daily wage. The criticism is the basic one that under the maritime doctrine of maintenance, wages and cure, wages, as such, do not extend beyond the end of the voyage. 2 Norris, The Law of Seamen § 541 at 136 (1952). If, however, the employment is for a period other than the voyage, such as on coastwise articles for six months [8] or for a definite time, the end of the voyage concept does not apply and wages are due him for the period of employment. Rofer v. Head & Head, Inc., 5 Cir., 1955, 226 F.2d 927, 1955 A.M.C. 2204.

■ The Judge, presumably because he felt that the voyage continued until the vessel next returned to her home port of Greenville, Mississippi, in April 1959 held that wages were due to that point, unless, as was the case, Tumey returned to work earlier. That was a mistaken view. The end of the voyage for this purpose would be the time and place cargo was discharged, or certainly no later than return to her next loading port. Cf. Farrell v. United States, 1949, 336 U.S. 511, 520–21, 69 S.Ct. 707, 93 L.Ed. 850, 1949 A.M.C. 613. Either of these events was shortly after the injury. Tumey, on the other hand, seeks to bring himself within the literal terms of Rofer, supra. He contends that since there was no fixed period of time and wages were merely determined for convenience on a monthly basis, his employment was "indefinite" and hence maintenance and cure wages extended for a like period. While loss of wages as an element of damages may perhaps extend almost indefinitely for the probably employable life of the seaman, that is not so with regard to this limited duty to pay wages as a part of cure.

■ The award for wages in the maintenance-wages-cure sense was, therefore, erroneous. We do not figure out, or require a remand as a part of the attempt, just what it should be. This is because on this record no more wages were allowed than were required as a matter of law.

■ The problem in this case arose, we think, out of a confusion shared presumably by court and counsel that wages, as such, for the past were pertinent only to the maintenance-wages-cure claim. That, of course, is not true. For a classic element of damages in any personal injury claim where the standard of recovery is a pecuniary loss, is the inability, or reduced ability, to earn wages. Consequently, in a seaman's action either under the Jones Act or maritime doctrine of unseaworthiness, a part of the recovery, if otherwise permissible, will be the loss of wages from the date of the injury down to the trial and, if established, the probable loss of wages in the future. That element of general damages would, on a jury trial, be for jury submission. On the other hand,

---

8. See Enochasson v. Freeport Sulphur Co., D.C.S.D.Tex., 1925, 7 F.2d 674, 1925 A.M.C. 1203; 2 Norris, The Law of Seamen § 541 at 138 (1952).

wages, in the maintenance-wages-cure sense is a very limited award. Perhaps offsetting its limited nature in terms of duration is the compensating feature that for an illness or injury suffered in the service of the ship, such wages are due as a matter of right wholly without regard to unseaworthiness or negligence or both.

■ It is obvious, however, that since the element of wages, as such, is inherent in each of the two types of recoveries, there must not be a duplication in the final award whether it is done by a Judge sitting in admiralty, by a jury hearing both phases where jurisdiction exists, or partly by the jury and partly by the Judge. Care must be taken by the Trial Judge to see that this does not occur. Evans v. Schneider Transportation Co., 2 Cir., 1957, 250 F.2d 710, 712, 1958 A.M.C. 832; Yates v. Dann, 3 Cir., 1955, 223 F.2d 64, 67, 1955 A.M.C. 1214; Handly v. United States, D.C.S.D. N.Y., 1958, 157 F.Supp. 616, 621, 1958 A.M.C. 1119; 2 Norris, The Law of Seamen § 541 at 69 (Supp. 1961). This is so where all counts are for jury determination or where, as here, they are split between Judge and jury. There are a variety of ways to accomplish this, the choice of which is ordinarily for the wise judgment of the Trial Court.[9]

■ But this concern ought not accidentally to bring about a complete disallowance of loss of wages in a record, such as this one, demonstrating adequately that there was an actual loss of wages for a determinable period. Here on the finding of negligence or unseaworthiness implicit in the general verdict for the plaintiff and its allowance of some damage showing thereby a finding of proximate, or FELA contributory, cause, Tumey was entitled as a matter of law to *some* award for lost wages. On this record which is free from contradiction on this score, the minimum would have been the amount lost from the date of the injury to the date he was able to, and did, return to work. That is exactly what the Judge awarded him.

■ By express instruction this part of wages had been withdrawn from jury consideration. The Court did, of course, leave open for jury determination the sum of money which would "reasonably compensate the plaintiff for any loss of earning power occasioned by the damage in question, and from which he is reasonably certain to suffer in the future." Hence, there is no indication that there was any substantial duplication. The only difference is that the Judge, on the insistence of the vessel owner who now complains of the resulting findings, fixed an element which ordinarily would have been for jury determination. Where the amount adjudged is practically to the very penny of what it had to be had Judge and jury each arrived at separate awards, no harm can have come from the fact that it was all lumped together.

Affirmed.

9. Not to be overlooked in this and countless other situations of today's litigation of growing complexity is the use of special interrogatories with appropriate instructions as a part of jury submission and verdict. F.R.Civ.P. 49(b). Warren Petroleum Co. v. Thomasson, 5 Cir., 1959, 268 F.2d 5, 9 n. 3; Clegg v. Hardware Mutual Casualty Co., 5 Cir., 1959, 264 F.2d 152. By appropriate specific questions and precise findings in terms of periods of time, the Court can ascertain the extent to which some award has been made. This might be in periods of time for loss of wages in the past, for the future, or if appropriate in terms of dollars for such periods, or combinations of both. This same problem may arise with respect to medical costs not furnished free to the seaman, and which are set forth as elements of his damage claim and also in the cure phase of his maintenance-wages-cure count. 2 Norris, The Law of Seamen § 568 at 190 (1952). The point is that guess work is eliminated as the veil of the general verdict is lifted.